# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Rafael Castillo-Sanchez

      Petitioner

v.

Brian Williams,[1] et al.,

      Respondents

Case No.: 2:18-cv-01598-JAD-NJK

**Order Denying Petition for a Writ of Habeas Corpus**

[ECF No. 21]

      Petitioner Rafael Castillo-Sanchez was found guilty in Nevada state court of first-degree murder with use of a deadly weapon for stabbing and killing his wife, Veronica Castillo,[2] and of assault with a deadly weapon for threatening Veronica's brother with a knife. He was sentenced to life in prison without the possibility of parole.[3] In a three-count petition, Castillo-Sanchez seeks a writ of habeas corpus under 28 U.S.C. § 2254, arguing that (1) trial counsel overlooked DNA evidence placing Veronica's blood on Castillo-Sanchez's body; (2) trial counsel failed to present a mental-health or insanity defense during the guilt phase of the trial; and (3) trial and appellate counsel failed to challenge three jury instructions.[4] I deny all three grounds on their merits because Castillo-Sanchez has not shown that his counsel's actions were deficient or prejudicial. And because no reasonable jurist would disagree, I deny a certificate of appealability.

---

[1] The state corrections department's inmate-locator page reflects that Castillo-Sanchez is incarcerated at High Desert State Prison. Brian Williams is the warden for that facility. *See* HDSP Facility (nv.gov). So I direct the Clerk of the Court to substitute Brian Williams for Respondent Dwight Neven under Fed. R. Civ. P. 25(d).

[2] I refer to Ms. Castillo by her first name because she shares a last name with the petitioner. No disrespect is intended by doing so.

[3] ECF No. 30-29.

[4] ECF No. 21.

## Background[5]

**A.      The facts underlying Castillo-Sanchez's conviction**

### *1.      The murder*

On October 27, 2005, Castillo-Sanchez lived in an apartment in Las Vegas, Nevada, with Veronica and three of their children, Rafael Jr., Antonio, and Iesha.  Private security guard Fred West was patrolling the area around the apartment at approximately 9:00 p.m. that night when he heard "a lot of noise," a woman screaming, and a window break.  He also saw a light extinguish from the rear window of Castillo-Sanchez's apartment.  West suspected it was a "family quarrel" and left to take a break.[6]

Veronica's brother, O'Sha Simmons, testified that he was walking to Veronica's apartment around 9:30 p.m. that night when he saw her "getting slammed up against" the rear window of her apartment.  Simmons went upstairs and heard Veronica screaming, "Rafael, Stop it."  Unable to open the apartment door, Simmons found his nephew Antonio, who was nearby, and asked for a key to the apartment.  Antonio's brother Rafael Jr. had the key, so after Simmons and Antonio unsuccessfully tried to kick open the front door, they broke open an adjacent window.[7]

Simmons testified that he entered the apartment through the window and saw Castillo-Sanchez "laying ['right against'] the door in, like, a fetal position," "cut up," and bleeding. Antonio said that he saw his father walk to the kitchen, grab a knife, and head toward Simmons saying, "'You're going to die, you're going to die.'"  Simmons went to the bedroom, saw

---

[5] These facts are taken from the trial transcript.

[6] ECF No. 29-57 at 11–26; ECF No. 53-14 at 4–5; ECF No. 53-15 at 5–6; ECF No. 53-16 at 19.

[7] ECF No. 53-14 at 10–13; ECF No. 53-15 at 10–12.

2

Veronica's reflection in the headboard mirror, and told Antonio to call the police. Antonio left to call 911 from a neighbor's cellphone, followed by Castillo-Sanchez and Simmons. Simmons testified that Castillo-Sanchez appeared high or in shock and was staggering. Antonio noticed that his father's wrist was cut and he was "falling and stuff."[8]

Rafael Jr. testified that he was summoned to the apartment and saw Antonio "at the neighbor's door screaming," and "calling 911." Rafael Jr. went inside and found his mother lying in her bedroom. He held her, but she was non-responsive. Rafael Jr. ran to the kitchen, grabbed a knife from a drawer, and left to "hurt" his father. Antonio testified that Simmons re-entered the apartment with Rafael Jr. Antonio then saw Rafael leave the apartment with a knife and heard him say, "'You're going to do this to my mom, I'm going to do it to you.'" Antonio testified that he watched Simmons follow Rafael Jr. out of the apartment, but Simmons said that he first encountered Rafael Jr. after Rafael Jr. left the apartment, and had not seen Rafael Jr. inside the apartment. Rafael Jr. testified that he first saw Simmons outside after Rafael Jr. exited the apartment with the knife, and that Simmons stopped him and said, "You don't want to do that."[9]

Rafael Jr. testified that he threw the knife "under a car or truck" and he and Simmons ran up the street where they found his father. Rafael Jr. asked his father, "Man, what did you do that for" but his father was "in a daze" and didn't respond. Meanwhile, Antonio went to see if his mother was alive and saw "a lot of stuff" "knocked over," his parents' room "messed up," their bed "all crooked," "razors on the floor," "blood on the bed," and a lot of blood in the room. He touched his mother and "told her to wake up," but she didn't. Antonio left the apartment and

---

[8] ECF No. 53-14 at 16–23; ECF No. 53-15 at 12–44.

[9] ECF No. 53-14 at 16; ECF No. 53-15 at 13–24; ECF No. 53-16 at 6–8.

saw Simmons and Rafael Jr. arguing, saw Rafael Jr. drop the knife, and saw them go toward his father.  When the police arrived, Antonio and Rafael Jr. told police to "shoot" or "kill" their father because he killed their mother.  Rafael Jr. told police, "My mom, she's up there, she's bleeding, she's dying" and directed an officer to the apartment.[10]

Las Vegas Metropolitan Police (Metro) detective Christopher Herald testified that when he arrived on the scene, he found Castillo-Sanchez standing behind a vehicle, "bloody from head to toe" holding a knife; and Rafael Jr. at the front of the vehicle yelling, "He killed my mother, shoot him."  Herald also heard a "kid" behind him "screaming and yelling" that Castillo-Sanchez just killed their mother.  Herald directed Castillo-Sanchez to drop his weapon, and Castillo-Sanchez placed the knife on the trunk of a car.  Herald testified that Castillo-Sanchez had "cuts on both sides of . . . both wrists" and "a thousand[-]mile stare looking through" him.  Herald commanded Castillo-Sanchez to get down on the ground, but Castillo-Sanchez "was not paying any attention" and walked toward him, so Herald kicked him in the chest and Castillo-Sanchez fell "back onto his back."

Metro detective Karl Huysentruyt testified that he responded to the scene right behind Herald and found the family's apartment door open.  Without entering, he witnessed "a lot of blood in the master bedroom."  He saw a mirrored headboard that reflected Veronica lying on the ground covered in blood with "stab wounds on the top of her chest."  He announced his presence, received no response, entered the apartment, and confirmed that Veronica was dead.[11]

---

[10] ECF No. 53-15 at 14–27; ECF No. 53-16 at 9–10.

[11] ECF No. 29-57 at 28–61.

### 2. The Castillo children's accounts of their father's drug-use and their parents' relationship

Rafael Jr. testified at trial that he did not have a good relationship with his father. He told police that his father smoked crack and Primo. Rafael Jr. explained he cut his hand when he grabbed a knife from the kitchen drawer, got his mother's blood on his white t-shirt when he held her, and gave the t-shirt to a friend (L.G.) but later retrieved the t-shirt when police asked him for it. L.G. testified that she followed Rafael to the apartment and heard Castillo-Sanchez say, "Felito [Rafael's nickname], sorry." On cross-examination, L.G. admitted that she did not tell police that Castillo-Sanchez told Rafael he was sorry or that Rafael gave her his bloody t-shirt. Antonio said his father smoked crack and marijuana and acted paranoid and suspicious of "everything and everybody," thought the neighbors were stealing cable, and believed his wife was cheating.[12]

Iesha testified that she was at her cousin's house during the incident. She said her parents sometimes got along, but since May of 2005, there was "more distance, more arguing" and by October, the relationship was getting worse. Iesha stated that her father acted paranoid during that time. She explained that her father thought her mother "was maybe being sneaky, or thought that guys were calling her or something," and he suspected that another man ordered some furniture that was delivered to the apartment. Iesha testified that, beginning in May 2005, her father's "eyes were red," he was "just up all the time," and he thought his wife "was poisoning him" and "pouring contact-lens solution into his food." She agreed that her father's drug use increased as his behavior deteriorated.[13]

---

[12] ECF No. 29-55 at 34–51; ECF No. 53-16 at 10–51.

[13] ECF No. 53-15 at 53–69.

A fourth child, Veronica Castillo (Veronica Jr.), testified that Veronica and Castillo-Sanchez were her parents and that she didn't live with them when the incident occurred.  She stated that in 2004, her mother told her that she wanted a divorce.  Veronica Jr. called "a 1-800 number" about a divorce at her mother's request, but her mother ultimately didn't go through with it.  She noted that her parents came to her home the day before the incident, were acting "weird," and were not speaking to each other.  Veronica Jr. recounted that, after Castillo-Sanchez left, her mother told her that she felt "[h]urt, sad, [and] scared for her life."[14]

### 3.   *Castillo-Sanchez's admission of guilt*

Medical records introduced at trial showed that Castillo-Sanchez arrived at the University Medical Center (UMC) emergency room at 10:11 P.M. with self-inflicted wounds on his wrists and underwent surgery for his left wrist at 12:33 A.M. the next day.  He was given several narcotic medications, such as Fentanyl and Demerol, during and after the surgery to manage his pain.  Castillo-Sanchez's admission paperwork reflected that he ingested "half a gram of cocaine" the previous afternoon and tested positive for cocaine metabolites when he arrived at the hospital.  The records also indicated alcohol abuse, but they didn't contain any blood-alcohol-test results.

Dr. Michael Shawn Levy, an addiction-medicine specialist, testified at trial that cocaine is a stimulant that can cause hallucinations and psychotic or delusional behavior.  He explained that "when under the influence of cocaine," an individual "may magnify very innocent gestures, or manufacture situations that absolutely do not exist" and "totally believe that they exist." Based on the number and type of drugs administered to Castillo-Sanchez at UMC, the blood loss he suffered from his injuries and the surgery, and his cocaine use, Levy opined that an individual

---

[14] ECF No. 53-14 at 5–9.

"may be confused" or disoriented after surgery and adverse effects can exist several hours after ingesting such medications or cocaine.[15]

Metro corrections officer Angel Nunez testified that, the day after the incident, he relieved the officer who was assigned to stand guard over Castillo-Sanchez at UMC at around 11:00 A.M.  Nunez did not speak to Castillo-Sanchez until Castillo-Sanchez asked him if he spoke Spanish.  Nunez, who is fluent in Spanish, responded and Castillo-Sanchez told him that he wanted the nurse to remove his catheter so he could use the restroom.  Nunez told Castillo-Sanchez he would tell the nurse when she came into the room.  Nunez testified that about 15 minutes later, Castillo-Sanchez, speaking in Spanish, "blurted out" three times that he "had killed his wife." Nunez was surprised and didn't respond.  Nunez testified that Castillo-Sanchez's eyes were open and he was "kind of looking up" with tears coming down his face.  Unsolicited, Castillo-Sanchez "started talking about his wife," commenting that his wife physically abused him, "put things in his drink to make him pass out," he was not the father of two of his four children, and he heard his mother-in-law tell his wife to put things in his drink.  Nunez reported the statements to the officer assigned to guard Castillo-Sanchez and later prepared a report memorializing them.[16]

### 4.   Forensic evidence

#### a.   Veronica's cause of death

Gary Telgenhoff, a forensic pathologist at the Clark County Coroner's Office, performed Veronica's autopsy.  He testified that her cause of death was homicide by "multiple incised and stab wounds."  He found approximately 93 wounds, including stabs, incise wounds, cuts, nicks,

---

[15] ECF No. 29-60 at 4–35.

[16] ECF No. 29-57 at 66–84.

and abrasions all over her body, including 32 wounds concentrated in the upper-left portion of her chest.  The wounds were consistent with a violent confrontation and struggle.  There were 26 defensive wounds—the most Telgenhoff had seen in his 12-year career.

Telgenhoff found "three to five" stab wounds that, without medical attention, were lethal.  He explained that "the major wounds were in the lung area," causing the lung to collapse.  He testified that he "would expect this person to linger for quite some time with eventual blood loss and eventual respiratory difficulty."  He opined that Veronica "wouldn't have died right away"; it could have taken "minutes" or "over an hour."  Telgenhoff also posited that of the three knives found at the scene, the folding knife in the bedroom was most consistent with Veronica's wounds.[17]  He also noted that Veronica's blood contained cocaine at the time of the autopsy.

### b.  *Evidence recovered from Castillo-Sanchez and the crime scene*

Metro senior crime-scene analyst Stephanie Smith impounded three knives at the scene: (1) a "folding knife" with "a significant amount of blood" on the handle and blade from the "foot of the bed"; (2) a "kitchen-type knife" from the ground near a red pickup truck close to the apartment building; and (3) a [Henckels] knife, which had "a significant amount of" apparent bloodstains on the handle and blade from the "back trunk lid" of a white Nissan vehicle.  The knives were negative for fingerprints, but Smith obtained blood samples from the handles and blades of each knife.  Outside of the apartment, Smith recovered, among other things, Castillo-Sanchez's torn bloody shirt found near the Nissan and Rafael Jr.'s white t-shirt.  Smith testified that she saw a broken bedroom window with blood on the exterior wall "right above" the victim's location on the floor underneath a headboard inside the apartment.[18]

---

[17] ECF No. 29-59 at 6–60.

[18] ECF No. 29-51 at 32–105.

1    Robbie Dahn, another crime-scene analyst, photographed Castillo-Sanchez's injuries at

2  UMC.  She observed "injuries on both of his wrists," "injuries that were scratch-like on his arms

3  near and around the elbow," a "scratch-type injury" on his "left leg," and an injury to his heel.

4  Dahn swabbed Castillo-Sanchez's chest, neck, right arm, right hand, and the bottoms of his feet.

5  She also retrieved Castillo-Sanchez's clothes and took blood samples from each item of

6  clothing.[19]

7         *c.    DNA analysis*

8         Metro forensic-scientist Julie Marshner testified that she authored four reports containing

9  DNA analysis of the evidence collected in this case.  Shee concluded that Castillo-Sanchez was a

10 match for one of the DNA profiles on the folding knife's tip, hinge, and a second swab of the

11 knife's blade.  Veronica was also a minor contributor for the DNA profile taken from that knife's

12 hinge and blade.  Marshner confirmed that she found DNA alleles in the second swab of the

13 blade that did not match those of Castillo-Sanchez or Veronica, but she concluded that those

14 alleles did not indicate the presence of a third person's DNA.  She explained that a non-matching

15 allele might be "stutter peak" DNA, which is an artifact of the copying process conducted for

16 comparison testing in which a DNA profile does not fully duplicate.

17        Marshner also analyzed DNA taken from the Henckels knife recovered from the top of

18 the vehicle trunk.  Castillo-Sanchez's identity was assumed as a major contributor for a profile

19 taken from the Henckels knife handle and blade, and Veronica was a minor contributor for the

20 profile taken from the handle.  No third-party profiles were present on the samples taken from

21 the Henckels knife.  And Marshner's analysis of the third, unbranded knife revealed a major

22 DNA profile consistent with Castillo-Sanchez, and Veronica was not excluded as a minor

23

[19] ECF No. 53-13 at 9–14.

contributor.  There were additional alleles that didn't match Castillo-Sanchez and Veronica on that knife, but Marshner opined that a third-party's DNA wasn't present based on the overall profile.

Marshner testified that Castillo-Sanchez was the major contributor, and Veronica was not excluded as the minor contributor (greater than 99 percent of the population being excluded and she not), of DNA taken from blood on Castillo-Sanchez's arm.  The blood sample taken from the front neckline of Castillo-Sanchez's tank top bore a mixed DNA profile with Castillo-Sanchez as the major contributor and Veronica not excluded as a minor contributor.  DNA profiles on swabs taken from Rafael Jr.'s bloody t-shirt were consistent with Veronica.

Marshner admitted that she received no DNA reference profiles for anyone other than Castillo-Sanchez and Veronica.  She agreed that swabs of the third knife's handle, the folding-knife's blade, and Castillo-Sanchez's person produced a profile including an allele that did not match Castillo-Sanchez or Veronica, and that it could be stutter DNA or real DNA belonging to a third person.  But in Marshner's opinion, none of the profiles provided enough information to conclude that a third party's DNA was present.[20]

### 5.    *Castillo-Sanchez's version of events*

Castillo-Sanchez testified in his own defense at trial.  He explained that he and Veronica had "a lot of problems with [their son, Rafael Jr.] because of gangs" and his bringing "weapons to the house" in 2004.  In 2005, Castillo-Sanchez and Rafael Jr. were not getting along because Rafael Jr. "would frequently tell [him] that [he] wasn't his father and that [he] didn't have any reason to tell him what to do."  He averred that Rafael Jr. was "very violent" with him.  Castillo-Sanchez testified that his son got physical or aggressive "every time he would come home drunk

---

[20] ECF No. 29-53 at 9–65.

1   or on drugs" and "two or three times [Castillo-Sanchez] had to . . . search [Rafael Jr.'s] clothes"

2   for drugs, finding the drug PCP at least once.[21]

3            Castillo-Sanchez testified that on the evening of the incident, he and Rafael Jr. "weren't

4   speaking," and Rafael was "drinking Hennessey" in the living room.  Castillo-Sanchez drank

5   some beer that Veronica offered him, took his blood-pressure medication, and "just fell asleep"

6   sitting on the edge of the bed.  He claimed that when he woke up, "felt something burning [his]

7   hands," saw Rafael Jr. "on top of [him] with the knife in his hand," and thought his son "was

8   going to kill [him]."  He testified that Veronica "was saying: 'That's your dad, don't do anything

9   to him.'"  Castillo-Sanchez recalled being handcuffed, and Veronica was telling Rafael Jr., 'Take

10  them off, take off those handcuffs, that's your dad.'"  Castillo-Sanchez asserted that Rafael's

11  eyes "were red and he was sweating profusely."  When, Rafael Jr. removed the handcuffs,

12  Castillo-Sanchez "immediately reached and grabbed at the hand in which [Rafael Jr.] had the

13  knife, and [they] started to struggle."  He testified that Veronica "grabbed [Rafael Jr.] from

14  behind around the neck and threw him back . . . , and the two of us fell off the bed struggling

15  onto the floor."  Castillo-Sanchez continued struggling to get the knife while Veronica "held

16  [Rafael Jr.] tight," but Rafael Jr. pushed her off and she fell.  Veronica got up, grabbed her son

17  around the neck, "like she was choking him."  Rafael Jr. "got crazy trying to throw her off," and

18  started hitting Veronica "like a crazy man."  Castillo-Sanchez "got on top of him," and Rafael Jr.

19  started hitting him in the arms.  Veronica jumped on Rafael Jr. again, but he threw her off and

20  started attacking her.  Castillo-Sanchez said he cut his foot while kicking at Rafael Jr.[22]

21

22

-----

23  [21] ECF No. 30-1 at 22–27.

   [22] *Id.* at 31–39; ECF No. 30-7 at 26–28.

When Castillo-Sanchez saw his son "go after [Veronica] again" with a knife, he "ran out of the room crying for help" and got a knife from the kitchen to defend himself.  He claimed that Veronica was alive when he left the bedroom and he saw Rafael Jr. stabbing her.  Castillo-Sanchez heard Simmons outside the back window of the apartment shouting, "'Kill him, kill him, kill him.'"  Castillo-Sanchez tried to open the main door, but something held it shut.  He heard Simmons break "the window in front of the house" and saw him come in through the window.

Castillo-Sanchez testified that Rafael Jr. must have exited the apartment from the bedroom window after stabbing Veronica, noting that he "just felt like something went through the window, a strong noise like of glass."  He then saw Rafael Jr. "coming from behind the house" to the front door.  Rafael Jr. looked at him "strangely like his face was disfigured" and ran into the house while Castillo-Sanchez ran down the steps.  Moments later, Rafael Jr. left the house with a knife, and Rafael Jr. and Simmons came toward Castillo-Sanchez, "both of them with knives in their hands."  Castillo-Sanchez testified that he put the knife he was holding on the trunk of the car when the police arrived and got down on the ground without waiting for them to tell him to do so.  He said he didn't "feel very good" and the paramedics undressed him and took him to the hospital.  He denied speaking to anyone, claiming that he didn't think he had the strength to speak and was confused about what happened to him.[23]

Castillo-Sanchez claimed that he and Veronica didn't have any marriage problems.  He was unaware that Veronica may have sought a divorce, exclaiming, "No, my sweetheart she would never ask me or want a divorce from me neither would I from her.  Never."  He denied suspecting an affair, that another man bought her furniture, or that his mother-in-law told

---

[23] ECF No. 30-7 at 28–33; ECF No. 30-8 at 11–19.

Veronica to poison him.  He admitted that he used cocaine on the afternoon of the incident but not with Veronica, and that they used cocaine together twice a week for "two years or more." When asked whether he killed Veronica, Castillo-Sanchez responded, "No. She was my life, my sweetheart, she was everything to me, everything.  I never touched her with even the tip of my finger in 22 years; never, ever, no, nothing."[24]

Castillo-Sanchez testified that "everything" Officer Nunez said about his confession "was a lie."  Castillo-Sanchez said that when he came out of surgery, an officer obtained an interpreter, turned on a tape recorder, and read him his rights, but he requested an attorney.  He testified that the officer said, "'So you're not going to talk to me,'" and when Castillo-Sanchez didn't respond, the officer said "'F'k you,'" and left.  About 45 minutes later, Nunez came into his hospital room.  Castillo-Sanchez said that he "saw in [Nunez's] face . . . a child that's up to doing something bad and doesn't want anybody to know about it."  He told Nunez "absolutely nothing" because he was suspicious of the officers and "didn't know what was going on."  He said the medicine the hospital administered made him drowsy, so he covered his head with a sheet and went to sleep until he was taken to jail.[25]

Castillo-Sanchez further testified that he believed evidence was "planted" to incriminate him as his recollection of the crime scene did not match the photographs presented by the state. He insisted that his attorney showed him photographs that differed from the ones shown at trial, but those original photographs must have "disappeared" or been "hidden . . . somewhere."  He contended that the testimony about his t-shirt was suspicious because he was transported without a shirt, but an investigator testified that he arrived at the hospital "with half of a bloody t-shirt."

---

[24] ECF No. 30-1 at 30–35; ECF No. 30-7 at 46; ECF No. 30-8 at 5–6.

[25] ECF No. 30-7 at 40–46.

Castillo-Sanchez claimed that he had cuts on the bottoms of his feet from lying on his back kicking at Rafael Jr., but the photographs taken of him at UMC omitted those injuries.  And he testified that he believed the police planted evidence because Rafael Jr. and Simmons had knives in their hands and were standing near Castillo-Sanchez when the police arrived and told everyone to drop their weapons, but Rafael Jr.'s was not recovered in the place that Castillo-Sanchez believed it was dropped.

Castillo-Sanchez also testified that while he was held at the Clark County Detention Center awaiting trial, he was frequently transported to UMC for "illegitimate reasons" which it appears he believed were used to plant DNA evidence in his case.  He said that an officer took him to a doctor to have his lungs checked in 2007, but he did not suffer from lung problems.  He claimed that while he was there, a nurse injected something white into his arm that made him feel dizzy.  The nurse then used the same syringe to take blood from the back of his left hand.  Castillo-Sanchez testified that he believed the UMC visit corresponded with the submission of DNA evidence in his case.  He saved his hospital bracelets and paperwork, but they disappeared from his cell.[26]

## B.    Procedural background

The state charged Castillo-Sanchez with first-degree murder and assault with a deadly weapon on December 15, 2005.  About a month later, the state filed a notice of intent to seek the death penalty.[27]  In June 2010, a jury found Castillo-Sanchez guilty of first-degree murder with use of a deadly weapon for killing Veronica, and guilty of assaulting Simmons with a deadly

---

[26] *Id.* at 34–53; ECF No. 30-8 at 15–16.  The defense also called Jeff Schauer, Castillo-Sanchez's former supervisor at a job he held from 2003 to 2005.  ECF No. 30-8 at 20–25.  Because his testimony is not relevant to the grounds raised in Castillo-Sanchez's petition, I don't recount it here.

[27] ECF No. 27-12.

weapon.  During the penalty phase of the trial, the defense called psychologist Dr. Jose J. LaCalle, who testified that Castillo-Sanchez suffered from an IQ of 82 and "delusional disorder persecutory type."  The jury sentenced Castillo-Sanchez to life imprisonment without the possibility of parole for the first-degree murder conviction, finding that the mitigating circumstances outweighed the aggravating circumstances that, in the state's view, supported imposition of the death penalty.  In its special verdict for mitigating circumstances, the jury found that the "murder was committed while Defendant was under the influence of extreme mental or emotional disturbance" and drugs, and that Castillo-Sanchez "suffers from Delusional Paranoid Disorder, i.e., Delusional Disorder-Persecutory Type."  Castillo-Sanchez unsuccessfully sought relief on direct appeal and in state postconviction proceedings.[28]

## Discussion

Castillo-Sanchez contends that his trial attorneys provided ineffective assistance when they overlooked one of Marshner's DNA reports finding Veronica's DNA on the blood sample taken from Castillo-Sanchez's arm and shirt.[29]  He argues that counsel's negligence prejudiced him because the defense strategy—that Castillo-Sanchez was present when Veronica was attacked but wasn't the killer—was weakened by unanticipated evidence that her blood was found on him.  He also contends that counsel prejudiced him by failing to convey the contents of the report when advising him to accept an offer to plead guilty to second-degree murder.  He further claims that his trial attorneys were ineffective in failing to investigate and present a mental-health, diminished-capacity, or insanity defense during the guilt phase of the trial and he

---

[28] ECF No. 27-14 at 3; ECF No. 30-12; ECF No. 30-17 at 8–22; ECF No. 30-18 at 4; ECF No. 30-23 at 2; ECF No. 30-25 at 7–8; ECF No. 30-26; 30-29; ECF No. 31-7; ECF No. 32-25.

[29] Castillo-Sanchez had two trial attorneys, Ivette Maningo, Esq., and Charles Cano, Esq.  *See, e.g.*, ECF No. 29-44 at 2.

was prejudiced because counsel could have used those defenses to negate the intent element of first-degree murder.  Finally, Castillo-Sanchez avers that trial and appellate counsel were also ineffective in failing to challenge jury instructions explaining the requirements for finding malice and premeditation and directing the jury to administer "equal and exact justice."

**A.     Legal standards**

### 1.     Antiterrorism and Effective Death Penalty Act (AEDPA)

If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."[30]  A state court acts contrary to clearly established federal law if it applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[31]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[32]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[33]  The "objectively unreasonable" standard is

---

[30] 28 U.S.C. § 2254(d).

[31] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[32] *White v. Woodall*, 572 U.S. 415, 424–27 (2014).

[33] *Id.*

difficult to satisfy;[34] "even 'clear error' will not suffice."[35]  "The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."[36]

Habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[37] As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[38]  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[39]  AEDPA "thus imposes a 'highly deferential standard for evaluating state-court rulings,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[40]  If a federal district court finds that the state court committed an error under § 2254, the district court must then review the claim de novo.[41]  The petitioner bears the burden

---

[34] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[35] *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (citation omitted).

[36] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[37] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[38] *Id.* at 103.

[39] *Id.* at 101.

[40] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[41] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

of proving by a preponderance of the evidence that he is entitled to habeas relief,[42] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[43]

### 2. *Effective assistance of counsel*

The right to counsel embodied in the Sixth Amendment provides "the right to the effective assistance of counsel."[44]  Counsel can "deprive a defendant of the right to effective assistance[] simply by failing to render 'adequate legal assistance[.]'"[45]  In the hallmark case of *Strickland v. Washington*, the United States Supreme Court held that an ineffective-assistance claim requires a petitioner to show that: (1) his counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case;[46] and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[47]

A reasonable probability is "probability sufficient to undermine confidence in the outcome."[48]  Any review of the attorney's performance must be "highly deferential" and must adopt counsel's perspective at the time of the challenged conduct so as to avoid the distorting effects of hindsight.[49]  "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practice or

---

[42] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[43] 28 U.S.C. § 2254(e)(1).

[44] *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)).

[45] *Id.* (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 344–50 (1980)).

[46] *Id.* at 690.

[47] *Id.* at 694.

[48] *Williams v. Taylor*, 529 U.S. 362, 390–91 (2000).

[49] *Strickland*, 466 U.S. at 689.

most common custom."[50]  The burden is on the petitioner to overcome the presumption that counsel made sound trial-strategy decisions.[51]

The *Strickland* standard also applies to appellate counsel.[52]  Appellate counsel does not have a constitutional obligation to raise every nonfrivolous issue requested by the appellee.[53] "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues."[54]  So a petitioner must show that counsel unreasonably failed to discover and argue nonfrivolous issues.[55]  It is inappropriate to focus on what could have been done rather than focusing on the reasonableness of what counsel did.[56]  The petitioner must prove that, but for counsel's errors, he would have prevailed on appeal.[57]

The United States Supreme Court describes federal review of a state supreme court's decision on an ineffective-assistance claim as "doubly deferential."[58]  So the reviewing judge "take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of

---

[50] *Harrington*, 562 U.S. at 105.

[51] *Id.* at 104–05.

[52] *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citation omitted) (citing *Strickland*, 466 U.S. at 687–94).

[53] *Jones v. Barnes*, 463 U.S. 745, 751 (1983).

[54] *Id.* at 751–52.

[55] *Delgado v. Lewis*, 223 F.3d 976, 980 (9th Cir. 2000) (citation omitted).

[56] *Williams v. Woodford*, 384 F.3d 567, 616 (9th Cir. 2004) (citation omitted).

[57] *Smith*, 528 U.S. at 285 (citation omitted).

[58] *Cullen*, 563 U.S. at 190 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

1 § 2254(d)'"[59] and consider only the record that was before the state court that adjudicated the

2 claim on its merits.[60]

**B.  Castillo-Sanchez is not entitled to habeas relief for Ground One: trial counsel's failure to investigate and prepare for an overlooked DNA report.**

Ground One alleges that Castillo-Sanchez's trial attorneys were ineffective because they overlooked a DNA report concluding that Veronica's DNA was present in blood found on Castillo-Sanchez's arm and shirt.  Castillo-Sanchez claims that there is a reasonable probability that the result of the proceedings would have been different but for counsel's errors because (1) the defense strategy was based on the absence of Veronica's blood on Castillo-Sanchez's person, leaving counsel unprepared when they discovered the omission during the prosecutor's opening statements at trial; and (2) had counsel not overlooked the report, they may have advised Castillo-Sanchez differently about whether to accept a plea offer to second-degree murder.[61]

Respondents contend that these claims fail because Castillo-Sanchez does not allege "what additional information would have been obtained with further investigation" or "how it could have produced a different result" given the overwhelming evidence of guilt presented at trial.  They also argue that, based on testimony at the postconviction evidentiary hearing from trial counsel and Dr. Daniel Sussman (a psychiatrist who opined on Castillo-Sanchez's mental

---

[59] *Id.*

[60] *Id.* at 180–85.

[61] ECF No. 21 at 7–10.  In his reply, Castillo-Sanchez also suggests that, had counsel not overlooked the report, they may have changed their strategy to pursue an insanity defense at trial. ECF No. 48 at 9–10.  Castillo-Sanchez did not raise this argument as it relates to the overlooked DNA report in his amended habeas petition before this court, so I do not consider it.  *Delgadillo v. Woodford*, 527 F.3d 919, 930 n.4 (9th Cir. 2008) ("Arguments raised for the first time in petitioner's reply brief are deemed waived.").  Even if I did, I would deny it for the same reasons I deny Ground Two, *infra*.

1  state at the time of trial), the DNA evidence would not have convinced Castillo-Sanchez to plead

2  guilty because of his strong delusions of innocence.[62]

3         ***1.***     ***Additional background***

4            ***a.***     ***Castillo-Sanchez turned down several plea offers before trial.***

5         In 2006, the state trial court inquired whether a negotiated plea was possible and defense

6  counsel replied, "It's always possibl[e], but at this point I seriously doubt it."  In 2007, defense

7  counsel reported to the court that Castillo-Sanchez rejected a proposed guilty plea agreement,

8  and Castillo-Sanchez confirmed his unwillingness to accept the offer.  The following year, the

9  state advised the court that "there's an offer on the table, but [Castillo-Sanchez] has never

10  indicated any desire to plead," and defense counsel confirmed that Castillo-Sanchez again

11  rejected the offer.  In 2009, defense counsel advised that, against counsel's recommendations,

12  Castillo-Sanchez once again turned down a reasonable offer to resolve the case.  The court

13  warned Castillo-Sanchez that the offer would dissolve once a jury was empaneled and advised

14  him that, if he wanted to negotiate his case, he must do so before the day of trial.  Castillo-

15  Sanchez responded: "Your Honor, I have never, I don't need an offer, I don't need a negotiation.

16  I've never told my lawyers to seek an offer, because I'm innocent and I am going to prove my

17  innocence."[63]

---

23  [62] ECF No. 38 at 9–15.

   [63] ECF No. 27-24 at 3; ECF No. 28-22 at 3–5; ECF No. 28-33 at 4; ECF No. 29-9 at 44–45.

### b.   *Defense counsel overlooks a critical DNA report, discovers the oversight during the prosecution's opening statement, and requests a mistrial.*

In opening statements to the jury, the prosecutor argued that the jury would learn that Castillo-Sanchez confessed to killing his wife and that DNA consistent with only Veronica and Castillo-Sanchez was found on two knives and on Castillo-Sanchez:

> You're going to hear expert testimony in this case.  You're going to hear from DNA experts.  And you're going to hear that the DNA, the blood evidence at the scene, is consistent with two people, and that's the defendant and that's Veronica, including blood evidence from the knife that the defendant dropped on the trunk of the vehicle, including the knife recovered from the bedroom near Veronica's body, and Veronica's blood is all over the defendant and his clothing.

Defense counsel moved for a mistrial or continuance because they overlooked the December 2007 report stating that Veronica's DNA was on Castillo-Sanchez's body.  Counsel informed the trial court that counsel originally planned to argue in opening statements that none of Castillo-Sanchez's DNA was found on Veronica.  The court deferred ruling on the motions and directed the trial to proceed with defense counsel's opening remarks and Smith's testimony about the collection of evidence.[64]

In defense counsel's opening statement, counsel argued that the state would fail to prove its case beyond a reasonable doubt.[65]  He told the jury to be cautious in accepting Castillo-Sanchez's statement of guilt because it was made at the hospital after he had consumed cocaine, alcohol, and pain medications and while he was recovering from anesthesia.  Counsel argued there were no direct eyewitnesses to the struggle in the apartment and the jury would hear that

---

[64] ECF No. 29-51 at 11–17.

[65] Mr. Cano presented opening statements for the defense.

1  Rafael Jr. attacked Castillo-Sanchez with a knife, Castillo-Sanchez was injured on his wrists, and

2  Rafael Jr. gave his blood-covered shirt to a third party before police arrived at the scene.[66]

3        Defense counsel later conceded that they overlooked the DNA report and reiterated their

4  request for a mistrial or continuance, arguing that they were unprepared for trial because the

5  evidence in that report complicated their defense strategy, and because Castillo-Sanchez wanted

6  an evidentiary hearing as he always believed the DNA evidence was compromised.  The court

7  denied the motions, finding no prejudice because Castillo-Sanchez had admitted guilt, counsel

8  was aware that DNA from Veronica and Castillo-Sanchez was present on the knife found in the

9  bedroom, and witnesses placed Castillo-Sanchez in the apartment during the offense.  The trial

10  court, however, instructed the state to provide raw data for the overlooked report to defense

11  counsel so the defense expert could examine it during trial, and promised to allow the defense to

12  recall the state's witnesses after conferring with its expert.[67]

13
            *c.*     ***Testimony at the postconviction evidentiary hearing suggests that the***

14  ***DNA report may have weakened Castillo-Sanchez's defense, but he likely wouldn't have plead guilty even if he reviewed it before trial.***

15        At the postconviction evidentiary hearing, Castillo-Sanchez's lead trial counsel testified

16  that Castillo-Sanchez "maintained actual innocence from day one."[68]  She stated that her planned

17  defense at trial was that Rafael Jr. was the perpetrator, and Castillo-Sanchez was another victim

18  of his son's attacks.  Counsel testified that, before giving opening statements at trial, she was

19  aware that Veronica's DNA was found on "two knives" and was under the mistaken impression

20  that her DNA was not found on Castillo-Sanchez.  Counsel said that she nonetheless had

21

---

22  [66] *Id.* at 17–22.

    [67] *Id.* at 115–36.

23  [68] ECF No. 31-44 at 13.  Only one of Castillo-Sanchez's trial attorneys, Ivette Maningo, testified at the postconviction evidentiary hearing.

sufficient time to change the defense's opening statement once the report was discovered.

Counsel testified that, had the report not been overlooked, she would have ensured that the

defense expert "had time to review that particular report in conjunction with the raw data" and

determine that "that specific evidence was tested and processed the way it should have been."

She also would have discussed with Castillo-Sanchez "the significance of what [the DNA

evidence] meant, compared to the absence of it, and how that might have changed" the defense

strategy, counsel's cross-examination of the state's witnesses, and Castillo-Sanchez's testimony.

Counsel testified that the report weakened the defense's argument that Castillo-Sanchez was not

in close proximity to Veronica during the murder:

> Q. Is there anything about the fact that this report that actually
> caused you to alter your defense in this case, and that is that the
> Defendant didn't do it?
>
> A. It did alter it in the sense that based on what I believe my
> client's testimony was going to be, there was an explanation for
> why the victim's blood and his blood could be on both knives.
> And it strengthened that position to say that none of the blood from
> the victim was on his body.  So it altered it in a way.
>
> Q. It weakened your case?
>
> A. It weakens the case, yes.
>
> Q. But the Defendant ultimately testified that when the attack
> occurred by Rafael Jr., he was actually present with the victim
> when that attack occurred, correct?
>
> A. Present, but not necessarily close to her.  So that was an issue.
> . . . .
>
> Q. [Y]ou said on cross-examination that you had an explanation or
> were going to make argument with the explanation as to why both
> the victim's blood and the Defendant's blood could be on the two
> knives.  What did you mean by that?
>
> A. The argument was that the perpetrator used those knives to
> injure or hurt, to inflict injuries both on Mr. Castillo and Veronica.

Q. So you were prepared at the start of opening argument to say, okay, yeah the knives contained the DNA of both victim and the Defendant, but there is a reasonable explanation for that.

A. That's right.  That was the argument.

Q. You said on cross-examination that the DNA report that you then received in trial that surprised you weakened the defense?

A. It did.

Q. That's because now you have the victim's DNA on the Defendant himself?

A. That's right.

Q. Why did that concern you?

A. Based on the defense, he was being victimized by being handcuffed to a bed frame, so he was present in the room, but not necessarily in close proximity to the victim.  And the lack of DNA on his body supported that argument.[69]

Castillo-Sanchez's lead trial counsel further testified that she and her co-counsel were unaware of the DNA report linking Veronica's DNA to his person when they discussed with Castillo-Sanchez the state's offer to plead guilty to second-degree murder with use of a deadly weapon.  Counsel told Castillo-Sanchez at the time that accepting the offer was in his best interest, particularly because the state's case was strong, his defense was weak, and he faced the potential of receiving a capital sentence if he went to trial.  Counsel discussed Castillo-Sanchez's case with him at length before he rejected the plea agreement.  Castillo-Sanchez knew that family members were eyewitnesses and would testify against him, but he believed that they were

---

[69] *Id.* at 34–36.

persecuting him.  Counsel testified that the DNA report would have helped convince Castillo-Sanchez that the "state's case was strong and even stronger than [they] thought."[70]

Dr. Sussman, a psychiatrist who was previously called to opine on Castillo-Sanchez's competency to stand trial, testified at the postconviction evidentiary hearing that Castillo-Sanchez was likely insane at the time of trial, his condition made it difficult for him to assist counsel, and his illness made it unlikely that counsel could persuade him to accept a guilty plea because it was a "nonstarter" for him:

> Q. Everything you have said, coming back to trying to talk to a defendant about negotiation.  You know what I mean by that, hey, maybe you should take a second-degree murder here.  Is everything you are describing, his condition, going to make it difficult for lawyers to make a strong case for why the Defendant should enter—
>
> A. Absolutely.  It's going to be essentially a non-starter with him.  He's going to pretty much shut that down . . . You've been working on the post-conviction appeal for relief.  But I would be very surprised if lawyers . . . from the past saw something different.  As a matter of fact, the report says that there have been problems over time with him even being willing to talk with attorneys.  So he's been pretty dismissive over time, in terms of his willingness to work with attorneys.[71]

### 2.   *The Supreme Court of Nevada's determination*

The Supreme Court of Nevada determined that Castillo-Sanchez failed to demonstrate that trial counsel's failure to discover the DNA report sooner prejudiced him under *Strickland*:

> [C]astillo-Sanchez argues that trial counsel should have investigated a DNA report that identified his DNA on the victim.  Trial counsel learned of this DNA evidence during the [s]tate's opening statement and admitted overlooking the report that the [s]tate provided earlier.  Regardless of whether counsel's omission was deficient, Castillo-Sanchez has not demonstrated prejudice.  Trial counsel explained during the evidentiary hearing that the

---

[70] ECF No. 31-44 at 7–32.

[71] ECF No. 31-44 at 40–79; ECF No. 50-5.

defense theory was constrained by both Castillo-Sanchez's anticipated testimony that he was in the room with the victim when his son killed her in a three-person struggle and other DNA reports that counsel reviewed, indicating evidence of both his and the victim's DNA on the knives used in the killing found at the scene. In light of the overwhelming evidence of his guilt and the minor impediment that trial counsel could not argue as planned that Castillo-Sanchez was across the room from the victim rather than closer to her, Castillo-Sanchez has failed to show prejudice stemming from counsel's oversight. And to the extent that Castillo-Sanchez argues that appellate counsel was ineffective regarding this issue, he has not identified a meritorious appellate claim that counsel should have raised. *See Feazell v. State,* 111 Nev. 1446, 1449, 906 P.2d 727, 729 (1995) (holding that claims of ineffective assistance generally may not be raised on direct appeal). The district court therefore did not err in denying this claim.[72]

### 3. Trial counsel's failure to investigate the DNA report before the prosecutor's opening statement was not prejudicial.[73]

Castillo-Sanchez contends that I should review de novo whether counsel's performances were deficient because the Supreme Court of Nevada did not do so.[74] If a petitioner fails to satisfy either of the *Strickland* requirements, I need not consider the other.[75] Because the record supports the reasonableness of the Supreme Court of Nevada's determination that Castillo-Sanchez did not establish prejudice due to counsel's oversight of the DNA report, I do not consider whether counsel's performances were deficient.

The Supreme Court of Nevada's determination that, due to the overwhelming evidence of his guilt, Castillo-Sanchez was not prejudiced by counsel's failure to find the DNA report was

---

[72] ECF No. 32-25 at 2–3.

[73] Castillo-Sanchez does not claim in Ground One that appellate counsel was ineffective.

[74] ECF No. 48 at 9–10.

[75] *Strickland*, 466 U.S. at 697.

objectively reasonable.[76]  Nunez testified that he overheard Castillo-Sanchez state out loud that he killed Veronica.  Simmons claimed that he heard Veronica scream, "Rafael, Stop it," and shortly thereafter Antonio and Simmons found Veronica's body and Castillo-Sanchez—and no one else—in the apartment.  The coroner testified that, based on the wounds inflicted on Veronica, the bloody folding knife found in the bedroom with Veronica's body was the likely murder weapon.  The DNA expert testified that the bloody folding knife and the Henckels knife Castillo-Sanchez possessed when he left the apartment each bore DNA belonging to Castillo-Sanchez and Veronica, and no third party.  And Castillo-Sanchez's testimony placed him in close proximity to Veronica at the scene of her injuries and the bloody knife.

When defense counsel discovered the overlooked DNA report, the trial court directed the state to provide the raw data for that DNA report to defense counsel for expert review during trial.  Defense counsel did not recall the relevant witnesses to testify concerning that newly discovered DNA evidence or attempt to call a defense expert on the topic.  Although counsel stated that the defense strategy would have been different had the report not been overlooked, Castillo-Sanchez failed to identify a strategy that would facilitate a reasonable probability the result of the proceedings would have been different had counsel known about the DNA report

---

[76] In its opinion, the Supreme Court of Nevada erroneously stated that the DNA report identified Castillo-Sanchez's DNA "on the victim."  *See supra*, at p. 26.  But the record shows that Castillo-Sanchez argued to that court, and the trial record confirms, that the overlooked DNA report found Veronica's DNA on Castillo-Sanchez.  ECF No. 32-6 at 25–32.  Neither party challenges the state supreme court's imprecise statement, and I find that the error does not constitute a basis to conclude that the state supreme court relied on an objectively unreasonable determination of the facts in light of the state-court record.  *See, e.g.*, *Wiggins v. Smith*, 539 U.S. 510, 528 (2003) (finding clear and convincing evidence that the state court relied on a "on a clear factual error" for its conclusion, constituting an "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.").  The Court's conclusion—that the overwhelming evidence of Castillo-Sanchez's guilt outweighs the impact of the overlooked DNA report—remains correct in the absence of the error.

when they prepared for trial.  And ultimately, trial counsel's defense was consistent with Castillo-Sanchez's testimony and the overlooked DNA evidence, as Castillo-Sanchez testified that both he and Veronica wrestled with an armed Rafael Jr. in the moments leading up to Veronica's death.  So, based on the overwhelming evidence of Castillo-Sanchez's guilt presented at trial, the Supreme Court of Nevada's determination that Castillo-Sanchez was not prejudiced by trial counsel's oversight of the DNA report is neither contrary to, nor constitutes an unreasonable application of, clearly established federal law, and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings.  So Castillo-Sanchez is not entitled to federal habeas corpus relief for this portion of Ground One.

### 4.     Trial counsel's failure to inform Castillo-Sanchez of the DNA report when considering whether to accept a plea deal was also not prejudicial.

Castillo-Sanchez also contends that he was prejudiced by counsel overlooking the DNA report because, but for that error, counsel "may" have convinced Castillo-Sanchez to accept the guilty plea offer to second-degree murder.[77]  Though this portion of his claim was arguably raised at his postconviction evidentiary hearing,[78] it appears that it was not raised before the Supreme Court of Nevada on direct appeal or in postconviction proceedings.[79]  "A federal habeas court generally may consider a state prisoner's federal claim only if he has first presented that claim to the state court in accordance with state procedures."[80]  But procedural default is an

---

[77] ECF No. 48 at 9–10.

[78] See ECF No. 31-44 at 47–58 (postconviction counsel asking trial counsel if this DNA evidence could have persuaded Castillo-Sanchez to take a plea deal); 79 (postconviction counsel asking to orally supplement his brief to assert that, "in order to properly advise a defendant of plea negotiations you must have done a thorough investigation").

[79] See ECF No. 30-52 (petitioner's brief on direct appeal); ECF No. 32-6 (petitioner's post-conviction appeal).

[80] Shinn v. Ramirez, 596 U.S. __, 142 S. Ct. 1718, 1727 (2022).

affirmative defense that the state must plead and prove—if it is not raised, the defense is waived.[81]  While a federal habeas court may sua sponte consider procedural default when its presence is obvious from the face of the petition,[82] it is not required to do so.[83]  Because the state did not raise a procedural-default defense to this portion of Ground One and the default is not clear from the face of the complaint, I address the argument on its merits.[84]

I find that Castillo-Sanchez was not prejudiced by trial counsel's failure to inform him of the results of the overlooked DNA report when advising him whether to accept a plea deal.  The record does not support a reasonable probability that Castillo-Sanchez would have accepted the plea offer even if counsel had confronted him with the overlooked DNA results.[85]  To satisfy the "prejudice" requirement when a petitioner failed to accept a plea offer, the petitioner must show that "the outcome of the plea process would have been different with competent advice,"[86] i.e.,

---

[81] *Bennett v. Mueller*, 322 F.3d 573, 585 (9th Cir. 2003); *Vang v. Nevada*, 329 F.3d 1069, 1073 (9th Cir. 2003).

[82] *Boyd v. Thompson*, 147 F.3d 1124, 1228 (9th Cir. 1998); *Vang*, 329 F.3d at 1073 (distinguishing circumstances when a court may *sua sponte* consider procedural default from those circumstances when the court should consider the defense waived).

[83] *See Day v. McDonough*, 647 U.S. 198, 209 (2008) (holding that "district courts are permitted, but not obliged, to consider, *sua sponte*, the timeliness of a state prisoner's habeas petition" and noting that a statute-of-limitations defense "must be treated the same" as a procedural-default defense).

[84] *Smith v. Ryan*, 823 F.3d 1270, 1285 (9th Cir. 2015).

[85] I note Castillo-Sanchez did not in the state postconviction proceedings or in this court claim that trial counsel were ineffective in failing to advise him to enter an *Alford* plea.  I therefore will not consider such a claim.  *See North Carolina v. Alford*, 400 U.S. 25, 37 (1970) (holding that a defendant may plead guilty "even if he is unwilling or unable to admit his participation in the acts constituting the crime."); *see also State v. Lewis*, 178 P.3d 146, 147 n.1 (Nev. 2008) (noting that whenever a defendant maintains his or her innocence but pleads guilty pursuant to *Alford,* the plea is nolo contendere and a nolo contender plea is the equivalent of a guilty plea) (quotation marks omitted), *overruled on other grounds by State v. Harris*, 355 P.3d 791 (Nev. 2015).

[86] *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (citations omitted).

but for counsel's errors, the petitioner would have pleaded guilty and would not have insisted on going to trial.[87]  Here, with the exception of the statement overheard by Nunez at the hospital, throughout the pretrial and trial proceedings Castillo-Sanchez maintained his innocence and claimed that Rafael Jr. killed Veronica.  Posttrial, his handwritten postconviction petition, filed long after the DNA report was discovered, voiced his opposition to a guilty plea because he argued that his trial attorneys were ineffective in attempting to coerce him to plead guilty by using threats, scare tactics, and putting "money on his books."[88]  Castillo-Sanchez's trial counsel and Sussman testified at the postconviction hearing that he "maintained his innocence from day one" and a guilty plea was a "nonstarter" for him.  Sussman further opined that, even if counsel was armed with the DNA report when she advised him on the plea deal, he did not believe that any scientific evidence would have persuaded Castillo-Sanchez to accept, noting that "his delusions are so strong and fixed" that it wouldn't have made any difference.  So I find that Castillo-Sanchez fails to establish that, but for counsel's oversight, there is a reasonable probability he would have accepted the plea offer instead of proceeding to trial.

**C.      Castillo-Sanchez is not entitled to habeas relief for Ground Two: trial counsel's failure to present an insanity defense.**

Ground Two alleges that Castillo-Sanchez's trial attorneys were ineffective because they failed to investigate and present a mental-health, diminished-capacity, or insanity defense during the guilt phase of the trial.  Castillo-Sanchez claims that counsel should have known that a sanity evaluation was necessary because Castillo-Sanchez underwent multiple competency evaluations

---

[87] *Turner v. Calderon*, 281 F.3d 851, 879 (9th Cir. 2002) (citing *Hill v. Lockhart*, 474 U.S. 52, 57–58 (1985)); *see also Lafler*, 566 U.S. at 164.

[88] ECF No. 31-17 at 13–15.

and was diagnosed with delusional disorder persecutory type.  Castillo-Sanchez argues that there is a reasonable probability that the result of the proceedings would have been different because, but for counsel's failure to investigate and present a mental-health defense, counsel could have presented strong evidence that Castillo-Sanchez could not form the requisite intent for first-degree murder.[89]

Respondents argue that Castillo-Sanchez cannot meet his burden because counsel testified that they "explored both a diminished-capacity defense and an insanity defense" but were unable to present an insanity defense because Castillo-Sanchez "was opposed to putting on a defense that would in any way admit or that would portray to the jury that he harmed his wife in any way."  Respondents also assert that Castillo-Sanchez fails to establish prejudice because there is overwhelming evidence of guilt.[90]

### 1. Additional background

#### a. Castillo-Sanchez's pre-trial competency evaluations and failure to cooperate with counsel

Castillo-Sanchez's trial attorneys were concerned about his competency "early on in the case," and in 2006 they obtained an evaluation by a licensed clinical psychologist who determined that Castillo-Sanchez was competent at that time to stand trial and to aid and assist counsel.  In May of 2008, defense counsel moved for a competency hearing under Nevada Revised Statutes §§ 178.405 and 178.415, claiming that Castillo-Sanchez's "ability to communicate with counsel" had "deteriorated," he became "increasingly resistant in cooperating with his defense team," and communications had completely broken down.  Counsel stated that

---

[89] ECF No. 21 at 10–13.

[90] ECF No. 38 at 15–19.

Castillo-Sanchez was "unable to calmly and rationally discuss his case in preparation for trial," making it impossible to "discuss strategy, options, possible outcomes[,] or any other substantive or procedural issues which are important to his defense."  Counsel argued that the facts of the case presented "several possible defenses" but Castillo-Sanchez was unable to consider and consent to counsel raising any of them.  The next day, Castillo-Sanchez filed a motion to dismiss counsel, claiming that he was innocent and counsel was keeping discovery from him.[91]

During the first round of competency evaluations, Dr. Mark J. Chambers found Castillo-Sanchez competent to stand trial but opined that he had "delusional beliefs regarding the merits of the case against him, which could lead to a distorted perception of his legal options," and his "paranoid, distrustful tendencies" could affect his "ability to work effectively with counsel."  Chambers's diagnostic impressions included "delusion disorder, persecutory type" but no malingering.[92]  Dr. Greg Harder's evaluation concluded that Castillo-Sanchez was "likely" incompetent to stand trial because he had substantial impairment or gross deficiency in his capacity to assist counsel in the defense.  Harder's diagnostic impressions included "schizophrenic, paranoid type" with "antisocial personality traits" and "legal illusions," but no malingering.[93]

Dr. Daniel Sussman provided a third evaluation concluding that Castillo-Sanchez was incompetent to stand trial due to substantial impairment or gross deficiency in his capacity to assist counsel in the defense.  Sussman's diagnostic impressions included "delusional disorder, persecutory type," and cocaine abuse, but ruled out antisocial personality disorder.  Unlike

---

[91] ECF No. 28-36 at 3–6; ECF No. 28-37 at 3.

[92] ECF No. 50-2.

[93] ECF No. 50-1.

Harder and Chambers, Sussman did not rule out malingering, but he found Castillo-Sanchez's story "more consistent with paranoid or persecutory delusions."  Sussman's evaluation noted that Castillo-Sanchez was "not aware of" not-guilty-by-reason-of-insanity pleas or outcomes. Although Sussman recommended anti-psychotic medication, he cautioned it "may not alter chronic fixed delusions."[94]

The state court found Castillo-Sanchez incompetent to stand trial and ordered him transported to Lake's Crossing Center (LCC) for restoration of competency.  Less than two months later, Castillo-Sanchez returned to court because three doctors at LCC found him competent, observed no mental illness, and concluded that he suffered from anti-social personality disorder, adjustment disorder, and substance abuse.  At a hearing on the defense's challenge to LCC's findings, Dr. Howard Hale Henson testified that Castillo-Sanchez's explanations for the crime were inconsistent with police reports, but there was no reason to believe Castillo-Sanchez was delusional.  Henson saw no indication that Castillo-Sanchez had a "disabling mental illness which would disqualify him as competent" or that he lacked the capacity to assist counsel.  The court determined that LCC failed to address whether Castillo-Sanchez suffered from stated delusions that defense counsel was fabricating evidence against him in collusion with the prosecution and ordered Castillo-Sanchez returned to LCC.  Less than a month later, Castillo-Sanchez returned to court because the doctors at LCC again found him competent to stand trial.  The court adopted that finding.

Later that year, Castillo-Sanchez moved to dismiss his counsel, complaining that counsel "put money on [his] books" at the jail without his consent in an attempt to coerce him "into accepting a plea bargain" and that the timing and procedure of his DNA sample, blood draws,

_____

[94] ECF No. 50-3.

and blood evidence reports were suspect. He again insisted that he was innocent and vowed to "fight this to the end." The motion was denied.[95]  In 2009, Castillo-Sanchez filed another motion to dismiss counsel that, in addition to the complaints in the previous motion, complained of counsel's failures to communicate about Castillo-Sanchez's "feelings of being forced into a plea bargain," mistakes about the number of prior felonies that "influenced" that "deal," failure to investigate his case, and unauthorized communications with "other people" about his prior convictions. At the hearing on the motion, Castillo-Sanchez requested the knife and blood evidence, and counsel confirmed that it was provided to him. Castillo-Sanchez insisted that the hospital injected him with something and drew his blood, and the prosecutor suspiciously had blood evidence four days later. The motion was denied.[96]

The following month, Castillo-Sanchez again moved to dismiss counsel, claiming that his lawyers called him "crazy" when he explained that an officer forced him to go to UMC to have his lungs checked even though he has no lung problem, and a nurse injected him with a "liquid" that made him dizzy and drew blood against his will. At the hearing on the motion, defense counsel explained that the issue arose because nothing tied Castillo-Sanchez's DNA to the scene of the murder during the first year and a half the case was pending, but the defense later received DNA evidence. Counsel explained that Castillo-Sanchez had been taken to the hospital for angioplasty, that blood was drawn during a follow-up visit, and Castillo-Sanchez believed the blood was improperly taken from him and planted as evidence against him. Counsel stated that the defense believed that the DNA evidence came from Castillo-Sanchez's buccal swab and there was no reason to believe the state was "in cahoots with UMC" and the jail, or that they

---

[95] ECF No. 27-10 at 40; ECF No. 28-39 at 4–5; ECF No. 28-40; ECF No. 28-42 at 4–7; ECF No. 28-44 at 4–42; ECF No. 28-47; ECF No. 28-48; ECF No. 28-49; ECF No. 29-1 at 2–4.

[96] ECF No. 27-10 at 41–42; ECF No. 29-2.

planted evidence against him.  The prosecutor confirmed that the blood evidence was impounded under normal procedures and Castillo-Sanchez's conspiracy theory was baseless.  Defense counsel said that they had conversations with third parties about the case to develop mitigation evidence and that Castillo-Sanchez was not speaking to defense counsel.  The state court denied the motion.[97]

At a status hearing in March of 2009, defense counsel stated they had "been talking with Mr. Castillo-Sanchez since our last court meeting" and "everything is going on the right path there."  The following month, however, defense counsel advised the court that Castillo-Sanchez was no longer cooperating with the defense team, and again raised concerns about competency. The state court heard from counsel and Castillo-Sanchez outside the presence of the prosecutor during which counsel explained that Castillo-Sanchez was unable to assist counsel because he truly believed his attorneys were conspiring with the prosecutor and that he refused to speak with his counsel or the defense experts to prepare for trial.  After discussion with Castillo-Sanchez about his concerns, the court stated, "there is no doubt in my mind that he is competent" but merely unwilling to cooperate.  At defense counsel's requests, the court ordered further competency evaluations.[98]

In May of 2009, the state court announced that Dr. Mortillaro found Castillo-Sanchez competent to stand trial, concluding that, "if the defendant doesn't cooperate with counsel, basically, it is his choice."  Defense counsel argued that Mortillaro opined that Castillo-Sanchez exhibited signs of "paranoid personality disorder," which counsel believed prevented him from assisting counsel.  The court, after noting that Castillo-Sanchez was lucid and argued his position

---

[97] ECF No. 27-10 at 43–44; ECF No. 29-5; 29-6.

[98] ECF No. 29-7 at 4; ECF No. 29-8.

1  persuasively at the last hearing, concluded that he was capable of assisting counsel but chose not

2  to do so.  Defense counsel stated that Castillo-Sanchez refused to talk with counsel, hung up

3  when they called, refused visits, and refused to talk about his defenses or testimony.  Castillo-

4  Sanchez insisted that the court appoint alternate counsel or alternatively permit him to represent

5  himself, but the motion was denied.  The court concluded that it was Castillo-Sanchez's choice

6  whether to assist counsel with his defense or not.  But at a subsequent hearing, Castillo-Sanchez

7  was found incompetent and returned to LCC.  In October of 2009, Castillo-Sanchez returned

8  from LCC, and the state court noted that Dr. Henson and two other doctors at LCC found

9  Castillo-Sanchez met the criteria for competency.  The court scheduled a competency hearing at

10  defense counsel's requests, but the requests were later withdrawn, and the court concluded that

11  Castillo-Sanchez was competent to stand trial based on the LCC reports.[99]

12       In November of 2009, defense counsel informed the state court that they "still have an

13  issue" communicating with Castillo-Sanchez but were ready for trial.  Castillo-Sanchez stated

14  that he was suing his attorneys "for doing a bad job and being in cahoots with the DA to present

15  false evidence."  In May of 2010, defense counsel informed the court that Castillo-Sanchez "is

16  still unable to assist them" and Castillo-Sanchez stated that he did not cooperate with his

17  attorneys because they were not helping him, and he would cooperate if they helped him.  At a

18  trial-status hearing later that month, Castillo-Sanchez insisted on his innocence, claimed he was

19  taken to UMC 10 times where they put something in his blood, and he had documents to prove it.

20  The court directed defense counsel to review the documents, but Castillo-Sanchez interjected

21  that counsel already saw them and wouldn't help him.[100]

22

23  [99] ECF No. 29-9; ECF No. 29-10; ECF No. 29-12; ECF No. 29-13; ECF No. 29-20; ECF No. 29-21; ECF No. 50-4.

[100] ECF No. 29-22; ECF No. 29-25; ECF No. 29-28.

1

2

  **b.**     *Trial testimony concerning Castillo-Sanchez's mental health, substance abuse, and competency*

3      Defense counsel disclosed seven of the doctors who evaluated Castillo-Sanchez for

4   competency during the pretrial proceedings as expert witnesses for trial.  Counsel also submitted

5   proposed jury questions that included, "Have you or any member of your family been diagnosed

6   with a mental illness and/or disease?" and "What is your opinion of psychiatrists/

7   psychologist[s]?"  During voir dire, the trial court and counsel questioned prospective jurors

8   about their attitudes and experiences with psychologists and psychiatrists.[101]

9      During the guilt phase of the trial, the defense called Dr. Levy to testify about the effects

10   of cocaine and alcohol intoxication and the drugs administered to Castillo-Sanchez at the

11   hospital, but they did not call any of the seven competency evaluators.  During the penalty phase

12   of the trial, the defense called psychologist Dr. Jose J. LaCalle, who testified that Castillo-

13   Sanchez suffered from "delusional disorder persecutory type" meaning "you think somebody is

14   after you."  LaCalle testified that he conducted six interviews with Castillo-Sanchez,

15   administered the Spanish version of the Wechsler Adult Intelligence test, and concluded that

16   Castillo-Sanchez was "functioning at IQ level of 82," which is the "lowest end of the average

17   intelligence" range of 80 to 100.  He explained that "people with 82 IQ" "cannot be expected to

18   be consistent, nor do they care to be consistent," rather; "they incorporate whatever is happening

19   at the moment into the system."

20      LaCalle explained that Castillo-Sanchez's delusional disorder is not the "bizarre type" of

21   delusional disorder because the delusions "might be real" and are not based on schizophrenic

22

23   ---

[101] ECF No. 29-27; ECF No. 29-40 at 4; ECF No. 29-44 at 32; ECF No. 29-46; ECF No. 29-47; ECF No. 29-50.

paranoia.  He said the prior competency evaluations have "some variations" but all portray Castillo-Sanchez as suffering [from] . . . delusional paranoia."  He concluded that Chambers's diagnostic impression of delusional disorder; Harder's impression of delusional disorder, persecutory type; and Mortillaro's impression of personality disorder, paranoid type, all coincide with LaCalle's diagnosis.

LaCalle asserted that Castillo-Sanchez's trial testimony was consistent with his diagnosis and that, although the onset of the disorder occurred many years ago, a new incident can be "an event so destructive for the person, so terrifying for the person that he cannot cope with that," and "cannot admit that," causing the person to create a reality "in which he's not responsible for that event."  LaCalle claimed that Castillo-Sanchez "never admitted to anybody that he actually killed his wife," and "his delusion is so powerful even today [that] you will never convince this guy that he did it."  LaCalle explained that this was a "defense mechanism" and there is no evidence "that the person suffering from this disorder will accept."

LaCalle further testified that he requested a neuropsychological evaluation by Dr. Inez Modillo to "rule out the organic origins or causes of" Castillo-Sanchez's diagnosis, and Modillo found no organic basis.  LaCalle averred that Castillo-Sanchez's spontaneous admission at the hospital does not change his opinion because at the time Castillo-Sanchez was "heavily sedated and hurting."  LaCalle denied that Castillo-Sanchez's admission means the delusion or paranoia developed after the murder, pointing out that the delusion persisted in prison in the absence of narcotics.[102]

---

[102] ECF No. 30-17 at 8–22; ECF No. 30-18 at 4.

1          *c.     Postconviction proceedings*

2          In 2016, Dr. Daniel Sussman prepared a written psychiatric opinion for Castillo-

3  Sanchez's state postconviction proceedings.  In it, he diagnosed Castillo-Sanchez with

4  "delusional disorder, persecutory type" and concluded he "likely was insane at the time of the

5  commission of the murder."  At the state postconviction evidentiary hearing, Sussman testified

6  that Castillo-Sanchez believed his family members "were trying to kill him," and Castillo-

7  Sanchez struck the doctor "as a strong-willed individual" who would not "want to capitulate to a

8  plea agreement in the context of strong feelings that he's the victim and that people are trying to

9  kill him."  Sussman did not believe Castillo-Sanchez appreciated "the nature and quality of his

10  actions" as "Castillo-Sanchez tends to equivocate the murder by pointing to his own injuries

11  sustained as well as attributing murderous desire to kill him and his wife to his children."

12  Sussman noted that "he's never taken accountability for that murder that I've seen.  He attributes

13  it to his son in both 2008 and 2016.  First his son Rafael [Jr.].  Then more recently in 2016 he

14  attributed it to his son Juno.  Anybody but him."

15          On cross-examination, Sussman agreed that Castillo-Sanchez admitted to killing his wife,

16  but that did not change Sussman's opinion because Castillo-Sanchez did not appreciate the

17  wrongfulness or the nature and quality of the brutality of the event.  Sussman opined that

18  Castillo-Sanchez was incompetent and legally insane at trial and that defense counsel "clearly

19  could have" utilized insanity and diminished-capacity defenses.[103]

20          Trial counsel testified there were concerns "early on" about Castillo-Sanchez's

21  competency.  She recounted that counsel "struggled with that from day one" and "never did

22  believe [Castillo-Sanchez] could assist [counsel] in his representation in the end."  Counsel

23

---

[103] ECF No. 31-44 at 40–79; ECF No. 50-5.

testified that the strongest defense was a mental-health defense and they "explored both" diminished-capacity and insanity defenses, and at trial presented an involuntary-cocaine-intoxication defense.  Counsel maintained that Castillo-Sanchez "was opposed to putting on a defense that would in any way admit or that would portray to the jury that he harmed his wife in any way."  Counsel said that Castillo-Sanchez knew his admission that he killed his wife would be presented at trial.[104]

### 2.    *The Supreme Court of Nevada's determination*

The Supreme Court of Nevada determined that Castillo-Sanchez failed to establish counsel's performances were deficient for failing to present an insanity defense:

> Castillo-Sanchez next argues that trial counsel should have proffered an insanity defense.  Trial counsel explained that the defense theory proffered was a strategic decision in light of Castillo-Sanchez's anticipated testimony and his refusal to permit counsel to present a theory positing that he harmed the victim in any way.  Castillo-Sanchez thus did not demonstrate deficient performance.  *See Johnson v. State,* 117 Nev. 153, 163, 17 P.3d 1008, 1015 (2001) (holding that a defendant who is mentally competent to stand trial has an absolute right to preclude counsel's arguing an insanity defense); *cf. McCoy v. Louisiana,* 584 U.S. ___, 138 S. Ct. 1500 (2018) (holding that the defendant defines the ultimate objective of the defense and may insist on asserting his innocence during the penalty phase notwithstanding overwhelming evidence of guilt). Castillo-Sanchez has not shown extraordinary circumstances warranting a challenge to trial counsel's strategic decision.  *See Lara v. State,* 120 Nev. 177, 180, 87 P.3d 528, 530 (2004).  Castillo-Sanchez misplaces his reliance on caselaw regarding counsel's failure to evaluate a defendant's competence, as his competence was evaluated multiple times and counsel raised this issue before the trial court.  The district court did not err in denying this claim.[105]

---

[104] ECF No. 31-44 at 6–29.

[105] ECF No. 32-25 at 4.

### 3. *Counsel was not ineffective for failing to present an insanity defense.*

I apply deference to counsel's performances and to the Supreme Court of Nevada's determination that counsel did not perform deficiently in failing to present an insanity defense in the face of Castillo-Sanchez's anticipated testimony that Rafael Jr. killed Veronica and his steadfast opposition to taking any responsibility for Veronica's death. I find that the Supreme Court of Nevada's determination that counsel's performances weren't deficient is objectively reasonable in light of the record. An insanity defense is tantamount to a concession of guilt[106] and would have required Castillo-Sanchez to admit that he killed Veronica. But Castillo-Sanchez repeatedly proclaimed his innocence to counsel, to the state trial court, and to competency evaluators, and unwaveringly insisted that Rafael Jr. killed Veronica. Defense counsel testified that Castillo-Sanchez knew the state would present Nunez's testimony that Castillo-Sanchez confessed to killing his wife. Defense counsel further testified that insanity, mental-health, and diminished-capacity defenses were considered, but Castillo-Sanchez wouldn't cooperate with those defenses because they required admission of wrongdoing. "When a client expressly asserts that the objective of '*his* defence' is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt."[107]

---

[106] *See United States v. Read*, 918 F.3d 712, 721 (9th Cir. 2019); *United States v. Audette*, 923 F.3d 1227, 1236 (9th Cir. 2019) (stating that, if counsel had presented an insanity defense over the defendant's objection, the defendant would have a claim of ineffective assistance of counsel); *see also Pelligrini v. State,* 34 P.3d 519, 539 (Nev. 2001) (noting that "[r]easonable jurists have disagreed on whether proof of legal insanity satisfies the actual innocence benchmark of the fundamental miscarriage of justice exception [to procedural bars to habeas corpus claims].")

[107] *McCoy v. Louisiana*, 138 S. Ct. 1500, 1509 (2018) (citations omitted) (emphasis added in *McCoy*).

The record shows that counsel investigated Castillo-Sanchez's mental health by pursuing competency evaluations from 11 evaluators and presenting LaCalle's diagnosis that Castillo-Sanchez suffered from paranoid delusions and had an IQ of 82. Consistent with Castillo-Sanchez's position that he was innocent and his anticipated testimony that Rafael Jr. attacked him and killed Veronica, defense counsel presented an intoxication defense during the guilt phase of the trial to explain Castillo-Sanchez's confession and presented the LaCalle's testimony to support a life, rather than death, sentence during the penalty phase. Defense counsel's strategy was objectively reasonable, consistent with Castillo-Sanchez's desire not to accept responsibility for the murder and did not fall below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances that defense counsel faced in this particular case. So I conclude that the Supreme Court of Nevada's determination is objectively reasonable and is neither contrary to, nor constitutes an unreasonable application of, clearly established federal law and is not based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceedings. Castillo-Sanchez is thus not entitled to federal habeas relief for Ground Two.

**D.   Castillo-Sanchez is not entitled to habeas relief on Ground Three: trial and appellate counsel's failures to challenge jury instructions 7, 8, and 28.**

Ground Three alleges that trial and appellate counsel were ineffective because they failed to challenge jury instructions 7 (malice), 8 (premeditation and deliberation), and 28 (equal and exact justice). Castillo-Sanchez claims that phrases in those instructions prejudiced him because the instructions are confusing and use archaic language, and his mental state at the time of the

offense raised a question whether he was capable of the requisite intent for first-degree murder.[108]  Respondents contend that any objection would have been futile.[109]

### 1. *Additional background—the jury instructions*

During voir dire, the trial court and counsel explained to the prospective jurors their obligations, the presumption of innocence, and the state's burden to prove guilt beyond a reasonable doubt.  Before opening remarks, the trial court reiterated that the state had the burden to prove guilt beyond a reasonable doubt.  And before closing remarks, the trial court again instructed the jury on the presumption of innocence and the state's "burden of proving beyond a reasonable doubt every material element of the crime charged and that the defendant is the person who committed the offense."[110]

The record establishes that trial counsel did not object to instructions 7, 8, and 28, and the trial court instructed the jury in relevant part as follows:

> **Instruction 6**: Murder is the unlawful killing of a human being, with malice aforethought, either express or implied.  The unlawful killing may be effected by any of the various means by which death may be occasioned.
>
> **Instruction 7**: Malice aforethought means the intentional doing of a wrongful act without legal cause or excuse or what the law considers adequate provocation.  The condition of mind described as malice aforethought may arise, not alone from anger, hatred, revenge, or from particular ill will, spite or grudge toward the person killed, but may result from any unjustifiable or unlawful motive or purpose to injure another, which proceeds from a heart fatally bent on mischief or with reckless disregard of consequences and social duty.  Malice aforethought does not imply deliberation or the lapse of any considerable time between the malicious intention to injure another and the actual execution of the intent but

---

[108] ECF No. 21 at 13–17.

[109] ECF No. 38 at 21–28.

[110] ECF No. 29-44; ECF No. 29-46; ECF No. 29-47; ECF No. 29-50; ECF No. 30-10.

denotes rather an unlawful purpose and design in contradistinction to accident and mischance.

Express malice is that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof.

Malice may be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.

**Instruction 8**: First Degree Murder is murder which is perpetrated by means of any kind of willful, deliberate, and premeditated killing. All three elements—willfulness, deliberation, and premeditation—must be proven beyond a reasonable doubt before an accused can be convicted of the first-degree.

Willfulness is the intent to kill. There need be no appreciable space of time between formation of the intent to kill and the act of killing.

Deliberation is the process of determining upon a course of action to kill as a result of thought, including weighing the reasons for and against the action and considering the consequences of the action.

A deliberate determination may be arrived at in a short period of time. But in all cases the determination must not be formed in passion, or if formed in passion, it must be carried out after there has been time for the passion to subside and deliberation to occur. A mere unconsidered and rash impulse is not deliberate, even though it includes the intent to kill.

Premeditation is a design, a determination to kill, distinctly formed in the mind by the time of the killing.

Premeditation need not be for a day, an hour, or even a minute. It may be as instantaneous as successive thoughts of the mind. For if the jury believes from the evidence that the act constituting the killing has been preceded by and has been the result of premeditation, no matter how rapidly the act follows the premeditation, it is premeditated.

**Instruction 9**: The law does not undertake to measure in units of time the length of the period during which the thought must be pondered before it can ripen into an intent to kill which is truly

45

deliberate and premeditated.  The time will vary with different individuals and under varying circumstances.

The true test is not the duration of time, but rather the extent of the reflection.  A cold, calculated judgment and decision may be arrived at in a short period of time, but a mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as first degree murder.

**Instruction 10**: The intention to kill may be ascertained or deduced from the facts and circumstances of the killing, such as the use of a weapon calculated to produce death, the manner of its use, and the attendant circumstances characterizing the act.

**Instruction 11**: All murder which is not First Degree Murder is Second Degree Murder. Second Degree Murder is the intentional, unlawful killing of a human being without premeditation and deliberation.

**Instruction 28**: Now you will listen to the arguments of counsel who will endeavor to aid you to reach a proper verdict by refreshing in your minds the evidence and by showing the application thereof to the law; but, whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be and by the law as given to you in these instructions, with the sole, fixed and steadfast purpose of doing equal and exact justice between the Defendant and the State of Nevada.[111]

### 2.  *The Supreme Court of Nevada's Determination*

I previously determined that Castillo-Sanchez fairly presented the Supreme Court of Nevada with claims that trial and appellate counsel were ineffective in failing to object to the instructions.[112]  However, the Supreme Court of Nevada determined only that appellate counsel was not ineffective in failing to challenge the instructions:

Castillo-Sanchez next argues that appellate counsel should have challenged the jury instructions on implied malice, premeditation, and equal and exact justice.  As this court has held the language

---

[111] ECF No. 30-10 at 7–12, 29.

[112] ECF No. 35 at 3–4.

used in the implied-malice instruction, *see Leonard v. State,* 117 Nev. 53, 78–79, 17 P.3d 397, 413 (2001), the premeditation instruction, *see Byford v. State,* 116 Nev. 215, 237, 994 P.2d 700, 714 (2000), and the equal-and-exact-justice instruction, *see Leonard v. State,* 114 Nev. 1196, 1209, 969 P.2d 288, 296 (1998), is not improper, we conclude that Castillo-Sanchez has failed to show that appellate counsel was ineffective in failing to raise these futile challenges. The district court therefore did not err in denying this claim.[113]

The Supreme Court of Nevada's affirmance order carefully differentiated and expressly addressed Castillo-Sanchez's other claims of ineffective assistance of trial and appellate counsel.[114]  So it appears that the Supreme Court of Nevada overlooked Castillo-Sanchez's claims that his trial attorneys were also ineffective in failing to challenge the jury instructions. "When the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge."[115]  I thus conduct deferential review of the appellate-counsel claims and find that the Supreme Court of Nevada's determinations are consistent with clearly established federal law based on a reasonable determination of the facts.  But I conduct de novo review of the trial-counsel claims because they were overlooked.

### 3.    *Counsel was not ineffective for failing to challenge the malice instruction.*

Castillo-Sanchez claims that trial and appellate counsel were ineffective in failing to challenge the phrases "abandoned or malignant heart" and "a heart fatally bent on mischief" contained in the malice instruction because those phrases convey nothing in modern language, are archaic and confusing, and permitted the jury to find malice if they believed that Castillo-

---

[113] ECF No. 32-25 at 5–6.

[114] *Id.* at 2–6.

[115] *See Johnson v. Williams*, 568 U.S. 289, 303 (2013).

1   Sanchez was a bad person.[116]  Respondents contend that the Supreme Court of Nevada has found

2   that the instruction accurately defines "malice aforethought," and "this was not a close case

3   where the good or bad character of the defendant might have swayed the jury."[117]

4        The Supreme Court of Nevada reasonably determined that appellate counsel's failure to

5   challenge the language in the malice instruction did not constitute deficient or prejudicial

6   performance.  The Supreme Court of Nevada is the final arbiter of state law and it previously

7   determined that the phrases "abandoned and malignant heart" and "heart fatally bent on

8   mischief" are constitutional "[a]bsent some indication that the jury was confused" by the

9   instructions such as to deny a defendant a fair trial.[118]  Here, Castillo-Sanchez points to nothing

10  in the state-court record suggesting that his jury expressed confusion about those phrases.  It is

11  well established that instructions "may not be judged in artificial isolation, but must be

12  considered in the context of the instructions as a whole and the trial record."[119]  The record

13  shows that the trial court instructed the jury on the presumption of innocence, the state's

14  obligation to prove "every material element" of the crimes charged beyond a reasonable doubt,

15  and their obligation to consider the instructions as a whole and not single out any particular

16  sentence.[120]  Finally, implied malice played no part in the jury's decision to convict Castillo-

17  Sanchez for killing Veronica, as the first-degree-murder verdict demonstrates that the jury

18

19  _____

    [116] ECF No. 21 at 15–16.

20  [117] ECF No. 38 at 21–23, 26–28.

21  [118] *See Leonard v. State*, 17 P.3d 397, 413 (Nev. 2001) (holding, "[a]bsent some indication that
    the jury was confused by the malice instructions (including the instruction on malice
22  aforethought and express malice), a defendant's claim that the instructions were confusing is
    merely speculative.") (citation omitted).

23  [119] *Estelle v. McGuire,* 502 U.S. 62, 72 (1991) (citations omitted).

    [120] ECF No. 30-10 at 3, 21.

necessarily found he committed the crime with express malice.[121]  So I conclude that the Supreme Court of Nevada reasonably applied *Strickland* in determining that appellate counsel's failure to challenge the malice instruction was neither deficient nor prejudicial.

Applying *de novo* review to Castillo-Sanchez's claim that his trial attorneys were ineffective in failing to object to the malice instruction, I do not find deficient performance under *Strickland*.  The malice instruction has been upheld as constitutional by the Supreme Court of Nevada.[122]  So counsel's failures to challenge the language in the instruction did not fall below an objective standard of reasonableness under prevailing professional norms in light of all of the circumstances of the particular case.  Castillo-Sanchez is therefore not entitled to federal habeas corpus relief for his challenge to the malice instruction.

### 4.  Counsel was not ineffective for failing to challenge the premeditation instruction.

Castillo-Sanchez claims that trial and appellate counsel were ineffective when they failed to challenge the phrase "instantaneous as successive thoughts of the mind" contained in the premeditation instruction because the phrase created a reasonable likelihood that the jury could convict for first-degree murder without a rational basis for distinguishing first- and second-degree murder and without proof beyond a reasonable doubt of the "premeditation and deliberation" necessary to find first-degree murder.  He further claims that the jury was provided no guidance on how to reconcile premeditation and deliberation with the concept of

---

[121] *See Scott v. State*, 554 P.2d 735, 738 (Nev. 1976) (holding that a verdict of first-degree murder necessarily includes a finding the defendant committed the murder deliberately, willfully, and with premeditation, and those elements conclusively establish express malice).

[122] *Leonard*, 17 P.3d at 413.

instantaneous and successive thought.[123]  Respondents contend that the Supreme Court of Nevada approved the instruction, the instruction is unambiguous when read in conjunction with Instructions 10 and 11, and Castillo-Sanchez fails to identify a different instruction that should have been given.[124]

The Supreme Court of Nevada has provided an approved instruction for state trial courts to present to juries in murder cases that conveys premeditation and deliberation as separate prerequisites for first-degree murder.[125]  Castillo-Sanchez's jury was given that instruction.[126] The Supreme Court of Nevada reasonably determined that appellate counsel's failure to challenge the premeditation instruction was objectively reasonable because that Court, as the final arbiter of state law, previously directed the state courts to use the language "instantaneous as successive thoughts of the mind."  Castillo-Sanchez presents no basis upon which to conclude there is a reasonable probability that the instructions, when read as a whole, deprived him of a fair trial in violation of due process.  The instructions did not omit an essential element of the crimes alleged or relieve the state of its burden of proof.[127]  And Instruction 9 gave the jury a way to reconcile the phrase "instantaneous as successive thoughts of the mind" for purposes of distinguishing first-degree murder from other unlawful killings.  Thus, the Supreme Court of Nevada reasonably applied *Strickland* in concluding that appellate counsel's failure to challenge the premeditation-and-deliberation instruction was neither deficient or prejudicial.

---

[123] ECF No. 21 at 16.

[124] ECF No. 38 at 23–25, 26–28.

[125] *Byford v. State*, 994 P.2d 700, 712–15 (Nev. 2000).

[126] *Compare* ECF No. 30-10 at 9–11, *with Byford*, 994 P.2d 714–15.

[127] *See Estelle*, 502 U.S. at 72.

Applying *de novo* review to Castillo-Sanchez's claim that his trial attorneys were ineffective for failing to object to Instruction 8, I find that their performance was not deficient under *Strickland*.  The Supreme Court of Nevada has upheld the constitutionality of the premeditation instruction read to the jury, the record fails to demonstrate that the jury was confused by the phrase, the instructions explain the concept in the context of first- versus second-degree murder, and Castillo-Sanchez presents no basis to conclude that the instruction denied him a fair trial.  So Castillo-Sanchez is not entitled to federal habeas corpus relief for his challenge to the premeditation instruction.

### 5.     *Counsel was not ineffective for failing to challenge the equal-and-exact-justice instruction.*

Castillo-Sanchez claims that trial and appellate counsel were ineffective in failing to challenge the phrase "equal and exact justice" contained in Instruction 28 because it minimized the state's burden of proof by creating a reasonable likelihood the jury would not apply the presumption of innocence and would convict Castillo-Sanchez based on a lesser standard of proof than required by the constitution.[128]  Respondents contend that the instruction is proper under Nevada law when read in the context of the instructions advising the jury on the presumption of innocence and the state's burden of proof.[129]

I find that the Supreme Court of Nevada reasonably applied *Strickland* in determining appellate counsel's failure to challenge the "equal-and-exact-justice" phrase was objectively reasonable.  The Supreme Court of Nevada previously approved the language and concluded that, contrary to Castillo-Sanchez's assertions, the "equal-and-exact-justice" phrase "does not

---

[128] ECF No. 21 at 16–17.

[129] ECF No. 38 at 25–28.

concern the presumption of innocence or burden of proof."[130]  There is also no basis to conclude that it was reasonably likely that the jury applied the language in the instruction in an unconstitutional manner.[131]

On *de novo* review, I find that trial counsel was not deficient under *Strickland* in failing to object to the language because the record demonstrates the trial court correctly and separately informed the jury on the presumption of innocence and the state's burden of proof, the language in the instruction was previously approved by the Supreme Court of Nevada, the language is unambiguous, and there is no indication the phrase denied Castillo-Sanchez a fair trial.  Castillo-Sanchez is not entitled to federal habeas relief for his challenge to the equal-and-exact-justice instruction.

**E.     A certificate of appealability is denied.**

The right to appeal from a district court's denial of a federal habeas petition requires a certificate of appealability.  To obtain that certificate, the petitioner must make a "substantial showing of the denial of a constitutional right."[132]  If the "district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[133]  When a district court denies relief on procedural grounds, the petitioner seeking a COA must show both "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason

---

[130] *Leonard*, 969 P.2d at 296.

[131] *See Estelle,* 502 U.S. at 72 n.4.

[132] 28 U.S.C. § 2253(c).

[133] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

would find it debatable whether the district court was correct in its procedural ruling."[134] Because I have rejected Castillo-Sanchez's constitutional claims on their merits, and he has not shown my assessment of his claims is debatable or wrong, I find that a certificate of appealability is unwarranted.  So I do not issue a certificate of appealability.

### Conclusion

IT IS THEREFORE ORDERED that Rafael Castillo-Sanchez's petition for a writ of habeas corpus under 28 U.S.C. § 2254 **[ECF No. 21] is DENIED**.

IT IS FURTHER ORDERED that, because reasonable jurists would not find my decision on the merits debatable or wrong, a **certificate of appealability is DENIED**.

IT IS FURTHER ORDERED that the Clerk of Court is directed to substitute Brian Williams for Respondent Dwight Neven.

IT IS FURTHER ORDERED that the Clerk of Court is directed to **ENTER JUDGMENT** accordingly and **CLOSE THIS CASE.**

_____
U.S. District Judge Jennifer A. Dorsey
September 22, 2023

---

[134] *Gonzalez v. Thaler*, 565 U.S. 134, 140–41 (2012); *Slack*, 529 U.S. at 484.

53